

```
2012-02184
     FILED
April 23, 2012
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

      0004192578
```

**16**

1  ASK LAW OFFICES®
   Alan Scott Koenig, Esq. (#44263)
2  P.O. Box 1170
   Berkeley, CA 94701-1170
3  Telephone: (510) 845-8968
4  Email: alan@asklaw.com

5  David I. Katzen, CSB # 79090
   David A. Schuricht, CSB # 62690
6  KATZEN & SCHURICHT
   1990 N. California Blvd., Suite 600
7  Walnut Creek, CA 94596-3744
   Telephone: (925) 831-8254 or 279-3080
8  Email: ksf@ksfirm.com

9  Counsel for Secured Creditor Bank Midwest, N.A.

10                 UNITED STATES BANKRUPTCY COURT
11                  EASTERN DISTRICT OF CALIFORNIA

12 | In re                                          | Case No. 12-21477
13 | YOUSIF H. HALLOUM,                             | Chapter 11
14 |         Debtor.                                |
15 | Tax I.D. # xxx-xx-2986                         |
   |------------------------------------------------|-----------------------
16 | CREDITOR COMMUNITY BANKS                       | Adversary Proc. No. _____
   | OF NORTHERN CALIFORNIA, an                     |
17 | operating division of real party in            | **COMPLAINT FOR FRAUD AND TO**
   | interest BANK MIDWEST, N.A.                    | **DECLARE DEBTS NONDISCHARGEABLE**
18 |         Plaintiff,                             |
19 |     v.                                         | No Hearing Requested
20 | YOUSIF H. HALLOUM,                             |
   |         Defendant.                             |
21

22       Plaintiff Creditor Community Banks of Northern California, an operating division of real

23 party in interest Bank Midwest, N.A., and successor to the primary lending relationship in this

24 bankruptcy ("Plaintiff"), alleges:

25       1. This adversary proceeding relates to the chapter 11 case styled *In re Yousif H.*

26 *Halloum*, pending in the Sacramento Division of United States Bankruptcy Court for the Eastern

27 District of California as No. 12-21477.

                                          1

2. The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b). Venue is proper under 28 U.S.C. § 1409(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

### Background Facts

3. Plaintiff's predecessor in interest, Community Banks of Tracy, made a secured loan to debtor Yousif H. Halloum ("Defendant"). (For the sake of simplicity from this point forward, the term "Plaintiff" refers to whichever entity occupied the lender's position at the relevant time.) The loan documents included a deed of trust on Defendant's real property commonly known as 14931 N. Flag City Blvd., Lodi, California ("Realty"), and a security agreement granting Plaintiff lien rights in substantially all of his personal property, including inventory and collateral proceeds. As of the commencement of Defendant's bankruptcy, the principal balance due on the loan exceeded $2,497,000.

4. Under the parties' "Business Loan Agreement," a copy of which is attached as Exhibit A, Defendant was obliged to furnish various true and correct financial documentation and to give Plaintiff prompt written notice of all material adverse changes in his financial condition. Absent Plaintiff's written consent, the agreement prohibited Defendant (a) from engaging in business activities substantially different from the gasoline station and convenience store he operated at the outset and (b) from making outside investments.

5. Rather than simply "boilerplate," these "Negative Covenants" included restrictions that were specifically added to Plaintiff's standard lending terms to address the import of Defendant's overall economic health, as affected by his revenues from operations and his expenditures, whether operational or otherwise. Defendant specially acknowledged these additional terms by initialing them.

6. According to Plaintiff's information and belief, during or about 2007, Defendant declined to renew a franchise agreement for his convenience store, for which the franchisor was also his fuel supplier; his relationship with the supplier then became rather strained; and the supplier was thereafter acquired by another entity ("BP") with more problematic policies.

7. Even before this development, Defendant had fallen behind on property taxes assessed against the Realty, a default under Plaintiff's deed of trust. However, in March and April of 2008, Defendant failed to make two monthly installment payments to Plaintiff, which obviously constituted direct monetary defaults.

8. Defendant told Plaintiff that business revenues weren't sufficient to meet cash needs because of the larger economic recession and because BP was wrongfully charging him a higher price for gasoline than it gave favored service station operators. Over the ensuing months, Plaintiff took a series of steps to support or assist Defendant, which included deferring and re-amortizing payments and also new loans to provide more working capital. Plaintiff made these accommodations based upon the above difficulties and Defendant's further explanations that he had encountered delays in completing a new car wash and Subway restaurant (due at least in part to the dispute with BP, with the delays exacerbating his working capital constraints), that extraordinarily high gas prices substantially reduced sales volume, and that the collapse of the construction industry and persistently high unemployment in the Central Valley also depressed volume. Plaintiff believed Defendant was largely acting responsibly and that his business was fundamentally sound and, as a community bank, Plaintiff generally tries to work cooperatively with deserving borrowers whose fortunes affect the local economy.

9. Despite Plaintiff's repeated accommodations, and although Defendant's business did show signs of improvement, he remained delinquent on property taxes. Eventually, to prevent a forced county tax sale that would have extinguished the lien of its first trust deed on the Realty, Plaintiff paid over $172,000 to the local tax authority in 2010.

10. Shortly thereafter, the parties entered into a "Change in Terms Agreement," a copy of which is attached as Exhibit B. Under this agreement, Defendant's principal debt was increased to $2,531,583.55, so as to encompass Plaintiff's property tax outlay and two smaller loans secured by junior trust deeds against the Realty; the loan maturity was extended; the interest rate was adjusted, and Defendant's payments were again re-amortized. Plaintiff made this extension of credit for the same reasons it had accommodated as described in paragraph 8.

11. In addition to the parties' loan relationship, Defendant established a deposit and checking account with Plaintiff, which he used to pay various business expenses. In particular, to satisfy substantial charges for gasoline deliveries, he authorized the fuel supplier to initiate electronic transfers from the account. During the latter part of 2010 and thereafter, the checking account balance was inadequate to cover these automated draws, entitling Plaintiff to dishonor them. However, Defendant warned that doing so could undermine his access to gasoline supplies and therefore destroy his business, and he continually assured Plaintiff that he would repay the overdrafts in the near term.

12. Based on those pleas and assurances, and for the same reasons it had accommodated as described in paragraph 8, Plaintiff reluctantly honored overdrafts on Defendant's checking account and, for about a year, it likewise countenanced these defaults and forbore in pursuing a receiver or foreclosure under the loan documents. However, the bank declined Defendant's request for a line of credit to term out the overdrafts, and it regularly pressed him to repay them as soon as possible and to maintain a sufficient balance in the account to avoid future overdrafts.

13. Unfortunately, despite repeated promises that he would clear the deficiency, Defendant made no discernable progress. Therefore, in July 2011, Plaintiff's counsel wrote to Defendant pointing out that he hadn't honored his commitments and reiterating that Plaintiff had the right to dishonor overdrafts and close his account. Counsel's letter emphasized that the situation was serious, and Defendant needed to get his relationship with Plaintiff back in good standing or face adverse consequences.

14. In October 2011, after the overdrafts had instead increased from $88,000 to about $190,000, Plaintiff advised Defendant that he had 10 days to establish alternative banking relationships for his business, that no further overdrafts would be honored thereafter, and that no overdraft would be honored in the interim if the cumulative total would exceed $300,000. However, during this 10-day cautionary period, Defendant took advantage of the bank's accommodation to boost the overdrafts to $297,372.49, presumably at least in part by directing business receipts somewhere else (rather than depositing them to pay draws on the account).

15. It now appears that, beyond the explanations described in paragraph 8, Defendant's failure to pay his property taxes and his subsequent overdrafts stemmed from a more pernicious cause. Unbeknownst to Plaintiff—and despite the loan agreement's explicit prohibitions on substantially different business activities and on outside investments—Defendant was diverting thousands upon thousands of dollars in Plaintiff's cash collateral to unauthorized, and thus improper, stock-option and securities speculation. At least from 2009 forward, Defendant routinely funneled cash from his business into securities accounts maintained in the names of his wife or his adult daughter, and he also wrote checks to his wife and daughter to fund their stock trading accounts. Defendant used these accounts for his day-trading activities. In calendar year 2010 alone, he lost hundreds of thousands of dollars on improper securities speculation funded with Plaintiff's cash collateral.

16. At the time he sought and obtained the 2010 credit extension, and continuing throughout the time that he extracted nearly $300,000 in aggressive overdrafts, Defendant was concealing his stock-option and securities speculation from Plaintiff. This improper activity was *not* included among Defendant's abiding explanations for his business difficulties as described in paragraph 8; securities trading was *not* reflected on any relevant financial statement; and Defendant *never* notified Plaintiff that attendant losses were a material adverse change in his financial condition. Obviously, however, the diversion of funds into ultra risky stock and option day-trading substantially reduced Defendant's working capital.

17. If Plaintiff had known either that Defendant was diverting cash collateral to fund prohibited and improper stock-option and securities trading; or that he was concealing the resultant losses from Plaintiff; or that he was misrepresenting the reason for his cash shortages; then—rather than making the accommodations and extending credit as described in paragraphs 8, 9, and 10, and rather than honoring and tolerating the ever bigger overdrafts and forbearing as described in paragraph 12—Plaintiff would have initiated prompt steps to recover amounts due before Defendant could divert additional collateral and before additional senior property taxes could accrue against the Realty, and Plaintiff would not have honored Defendant's overdrafts.

**Claim for Relief—Fraud (11 U.S.C. § 523(a)(2)(A))**

18. Plaintiff incorporates the allegations of paragraphs 3 through 17 above.

19. Defendant misled Plaintiff (a) by asserting that his business revenues weren't sufficient to meet cash needs for the reasons described in paragraph 8, rather than because he was investing and losing money on improper stock-option speculating and securities trading; (b) by failing to disclose material adverse changes in his financial condition attributable to such losses; and (c) by omitting all references to the stock trading from the financial statements that he provided to Plaintiff. Defendant further concealed the improper day-trading through securities accounts held in the names of his wife or his daughter instead of in his own name.

20. The representations or omissions described in paragraph 19 were false or fraudulent in that (a) according to Plaintiff's information and belief, Defendant's business revenues would have been sufficient to meet cash needs but for his improper stock-option and securities trading; (b) the stock market losses resulted in material adverse changes to Defendant's financial condition; and (c) omission of the stock trading from the financial statements made them materially inaccurate and misleading by concealing Defendant's improper and risk-laden conduct from Plaintiff.

21. Defendant knew the representations or omissions described in paragraph 19 were false or fraudulent when he made them.

22. In making the representations or omissions described in paragraph 19, Defendant intended to deceive Plaintiff into believing (a) that his business revenues weren't sufficient for the reasons described in paragraph 8, rather than because Defendant was investing in and losing money on improper stock-option speculating and securities trading; and (b) that Defendant wished to comply with his obligations, rather than that he was deliberately breaching them by engaging in business activities substantially different from the gasoline station and convenience store he operated at the outset and by making unauthorized outside investments.

23. Plaintiff did not know the representations and omissions described in paragraph 19 were false or fraudulent, and Plaintiff reasonably and justifiably relied on them (a) by granting

the credit extension provided by the "Change in Terms Agreement" described in paragraph 10; (b) by honoring overdrafts as described in paragraphs 12 and 14; and (c) by forbearing in exercise of its remedies despite Defendant's defaults.

24. As a proximate result of Defendant's deceptive conduct, Plaintiff has suffered damage (a) by forbearing in collection remedies for an extended period, which allowed Defendant to divert and dissipate additional cash collateral and to incur additional senior property tax liens as against the Realty and thereby eroded Plaintiff's security for amounts due from Defendant, all according to proof; and (b) by honoring overdrafts of $297,372.49, which Plaintiff would have dishonored if it had known the true cause of Defendant's cash shortages.

25. Because the representations and omissions described in paragraph 19 were false, because Defendant knew they were false when made and intended to deceive Plaintiff, because Plaintiff in fact reasonably and justifiably relied on those representations and omissions, and because Plaintiff suffered damages as a proximate result, Defendant is liable for actual fraud, and all of Plaintiff's attendant claims (for compensatory damages, interest, punitive damages, attorneys' fees, and costs) are nondischargeable under Bankruptcy Code § 523(a)(2).

**Prayer**

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A. For compensatory damages corresponding to overdrafts of $297,372.49;

B. For compensatory damages corresponding to additional cash collateral diverted and dissipated and additional senior property taxes incurred as against the Realty during the extension and forbearance caused by Defendant's deceptions, not to exceed any deficiency of remaining collateral to repay Defendant's secured debts to Plaintiff;

C. For prejudgment interest as allowed under California Civil Code §§ 3287 or 3288, to the extent not duplicative of contractual accruals;

D. For exemplary or punitive damages for Defendant's oppression, fraud, or malice;

E. For Plaintiff's reasonable attorneys' fees recoverable under the parties' agreements;

F. For Plaintiff's costs of suit;

G. For a determination that all of Defendant's debts to Plaintiff are nondischargeable; and

H. For such other and further relief as is just and appropriate.

Dated: April 23, 2012

                                        KATZEN & SCHURICHT

                                        By    /s/    *David I. Katzen*
                                                    David I. Katzen
                                Attorneys for Plaintiff Bank Midwest, N.A.

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,125,000.00 | 06-21-2005 | 06-21-2015 | 1880701 | 1EL / 150 | | DEJ | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

Borrower:  Yousif H Halloum
14931 N Flag City Boulevard
Lodi, CA 95242

Lender:  COMMUNITY BANKS OF TRACY
TRACY OFFICE
1003 CENTRAL AVENUE
TRACY, CA 95376

THIS BUSINESS LOAN AGREEMENT dated June 21, 2005, is made and executed between Yousif H Halloum ("Borrower") and COMMUNITY BANKS OF TRACY ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement ("Loan"). Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of June 21, 2005, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

Loan Documents. Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) subordinations; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

Payment of Fees and Expenses. Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

Representations and Warranties. The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

No Event of Default. There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

Organization. Borrower maintains an office at 979 Pearwood Circle, Lodi, CA 95242. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's principal office address or any change in Borrower's name. Borrower shall do all things necessary to comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

Assumed Business Names. Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

Authorization. Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

Financial Information. Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

Legal Effect. This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

Properties. Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

Hazardous Substances. Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the

EXHIBIT A

Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

> **Annual Statements.** As soon as available, but in no event later than thirty (30) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, prepared by Borrower.

> **Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

> **Additional Requirements.** BORROWER WILL PROVIDE LENDER WITH:
> 1. ANNUAL PERSONAL AND BUSINESS FINANCIAL STATEMENTS AND TAX RETURNS
> 2. VERIFICATION OF PAYMENT FOR PERSONAL INCOME TAXES - ANNUALLY (INCLUDING COPY OF CANCELLED CHECKS)
> 3. VERIFICATION OF PAYMENT FOR UNDERGROUND STORAGE TAX PAYMENTS TO THE CALIFORNIA STATE BOARD OF EQUALIZATION - QUARTERLY (INLCUDE COPY OF STATE REQUIRED FORM AND CANCELLED CHECKS)
> 4. VERIFICATION OF PAYMENT FOR SALES TAX PAYMENTS TO THE CALIFORNIA STATE BOARD OF EQUALIZATION - MONTHLY (INCLUDE COPY OF STATE REQUIRED FORM AND CANCELLED CHECKS).

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Subordination.** Prior to disbursement of any Loan proceeds, deliver to Lender a subordination agreement on Lender's forms, executed by Borrower's creditor named below, subordinating all of Borrower's indebtedness to such creditor, or such lesser amount as may be agreed to by Lender in writing, and any security interests in collateral securing that indebtedness to the Loans and security interests of Lender.

> **Name of Creditor**
>
> ARCO Products Company, a division of
> Atlantic Richfield Company, a Delaware
> Corporation

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

Loan Proceeds. Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

Taxes, Charges and Liens. Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.

Performance. Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

Operations. Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

Environmental Studies. Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

Compliance with Governmental Requirements. Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

Inspection. Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

Compliance Certificates. Unless waived in writing by Lender, provide Lender at least annually, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

Environmental Compliance and Reports. Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

Additional Assurances. Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

LENDER'S EXPENDITURES. If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

NEGATIVE COVENANTS. Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

Indebtedness and Liens. (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

Additional Financial Restrictions. BORROWER WILL NOT MAKE ANY OUTSIDE INVESTMENTS WITHOUT PRIOR WRITTEN APPROVAL FROM COMMUNITY BANKS OF TRACY

BORROWER WILL NOT MAKE ANY CAPITAL EXPENDITURES IN EXCESS OF $25,000.00 PER YEAR WITHOUT PRIOR WRITTEN APPROVAL FROM COMMUNITY BANKS OF TRACY.

Continuity of Operations. (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, or (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change ownership, dissolve or transfer or sell Collateral out of the ordinary course of business.

Loans, Acquisitions and Guaranties. (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

Agreements. Borrower will not enter into any agreement containing any provisions which would be violated or breached by the

EXHIBIT A

performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The death of Borrower or the dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**ADDITIONAL PROVISION.** BORROWER AGREES THAT IF EXCHANGE BANK DOES NOT SUBORDINATE THEIR UCC FILING TO OUR LOAN AND IF DUMAC LEASING DOES NOT SUBORDINATE THEIR LIEN BOTH LOANS WILL BE PAID IN FULL FROM THE PROCEEDS OF THIS LOAN.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any

EXHIBIT A

limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of SAN JOAQUIN County, State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means Yousif H Halloum and includes all co-signers and co-makers signing the Note.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

*EXHIBIT A*

GAAP. The word "GAAP" means generally accepted accounting principles.

Grantor. The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

Guarantor. The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

Guaranty. The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

Hazardous Substances. The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

Indebtedness. The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

Lender. The word "Lender" means COMMUNITY BANKS OF TRACY, its successors and assigns.

Loan. The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

Note. The word "Note" means the Note executed by Yousif H Halloum in the principal amount of $2,125,000.00 dated June 21, 2005, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

Permitted Liens. The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

Security Agreement. The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

Security Interest. The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED JUNE 21, 2005.

BORROWER:

X_____
Yousif H Halloum

LENDER:

COMMUNITY BANKS OF TRACY

By:_____
Authorized Signer

LASER PRO Lending, Ver. 5.26.10.005 Copr. Harland Financial Solutions, Inc. 1997, 2005. All Rights Reserved. - CA T:\CFI\LPL\C40.FC TR-244 PR-19

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,531,583.55 | 09-29-2010 | 09-21-2020 | 1880701 | | | SHK | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Yousif H. Halloum
14931 North Flag City Boulevard
Lodi, CA 95242

**Lender:** Community Banks of Northern California
Tracy
1003 Central Avenue
Tracy, CA 95376

---

**Principal Amount: $2,531,583.55**                **Date of Agreement: September 29, 2010**

**DESCRIPTION OF EXISTING INDEBTEDNESS.** Original terms of the existing indebtedness are as follows: Original Note Date: June 21, 2005; Original Maturity Date: June 21, 2015; Original Interest Rate: 7.00%, Variable, WSJP + 1.00%, Adjusting Every Two Years; Original Note Amount $2,125,000.00; Original Loan Number: 1880701.

**DESCRIPTION OF COLLATERAL.** Deed of Trust dated June 21, 2005, recorded in San Joaquin County, in the name of Yousif H Halloum, a married man as his sole and separate property. Property address: 14931 N. Flag City Blvd., Lodi, CA 95242.
APN: 055-160-52.

Commercial Security Agreement and UCC Financing Statement on All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

**DESCRIPTION OF CHANGE IN TERMS.**
The maturity date has been changed as shown below.
The interest rate has been changed to 4.75%, Fixed for 60 Months, then adjusting to WSJP + 1.00%, with a floor interest rate of 4.75%, fixed for the remainder of the term.
The principal amount has been increased to $2,531,583.55.
The monthly payments have been re-amortized as shown below.

The following Loan Covenant has been added:

Quarterly business operating statements.

All other terms and conditions of the Note, and Any Amendments, remain in full force and effect.

~~THE DEFAULT INTEREST RATE ON THIS LOAN HAS BEEN CHANGED TO 10.00% OVER THE CURRENT STATED INTEREST RATE OF THE LOAN.~~

**PAYMENT.** Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balances as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph: 60 monthly consecutive principal and interest payments in the initial amount of $14,521.94 each, beginning October 21, 2010, with interest calculated on the unpaid principal balances using an interest rate of 4.750%; 59 monthly consecutive principal and interest payments in the initial amount of $14,521.94 each, beginning October 21, 2015, with interest calculated on the unpaid principal balances using an interest rate based on the Prime Rate as published in the Wall Street Journal, when a range of rates has been published, the lower of the rate will be used (currently 3.250%), plus a margin of 1.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 4.750%; and one principal and interest payment of $1,873,147.89 on September 21, 2020, with interest calculated on the unpaid principal balances using an interest rate based on the Prime Rate as published in the Wall Street Journal, when a range of rates has been published, the lower of the rate will be used (currently 3.250%), plus a margin of 1.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 4.750%. This estimated final payment is based on the assumption that all payments will be made exactly as scheduled and that the Index does not change; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts on this loan.

**VARIABLE INTEREST RATE.** The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Prime Rate as published in the Wall Street Journal, when a range of rates has been published, the lower of the rate will be used (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each FIVE YEARS. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 3.250% per annum. The interest rate or rates to be applied to the unpaid principal balance during this loan will be the rate or rates set forth herein in the "Payment" section. Notwithstanding any other provision of this Agreement, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the last payment date of the just-ending payment stream. NOTICE: Under no circumstances will the interest rate on this loan be less than 4.750% per annum or more than the maximum rate allowed by applicable law. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) increase Borrower's payments to cover accruing interest, (C) increase the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD.** Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and

**EXHIBIT B**

Page 1 of 2

endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

X _____
Yousif H. Halloum

LENDER:

COMMUNITY BANKS OF NORTHERN CALIFORNIA

X _____
Authorized Signer

LASER PRO Lending, Ver. 5.63.00.003 Copr. Harland Financial Solutions, Inc. 1997, 2010. All Rights Reserved. - CA F:\procunebmo\CFI\LPL\D20C.FC TR-1299 PR-62

*EXHIBIT B*